## UNITED STATES  DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL  ACTION |
| VERSUS | NO. 01- 348 |
| ELIZABETH BOYETT SMITH | SECTION "N" |

## **O R D E R**

On June 4, 2004, Elizabeth Boyett Smith (hereinafter referred to as "Smith") filed for relief in this Court pursuant to 28 U.S.C. § 2255.  Her request for relief can generally be characterized along two lines of argument:  (1) ineffective assistance of counsel, and (2)  prosecutorial misconduct.  Smith's filings under § 2255 are voluminous.  The initial motion, for which she received permission to exceed the district court's page limitation, raised these two multi-faceted issues in a 94-page supporting memorandum.  After the government filed its response and Smith filed a 9-page opposition to that response, Smith moved to amend her motion to add further claims concerning counsel's performance at sentencing and other alleged sentencing errors.   The government responded to her new claims, whereupon Smith filed three opposition pleadings totaling 39 pages, and then sought to supplement her motion with a 3-page pleading.  Thereafter, Smith again supplemented her § 2255 motion with evidence she contends was newly discovered.

1

I.    **FACTS**

After a week-long trial, a jury in the Eastern District of Louisiana found petitioner Smith guilty of seven counts:  (1)  conspiracy to commit arson and mail fraud, in violation of 18 U.S.C. § 371, (2) arson, in violation of 18 U.S.C. § 844(I), (3)  mail fraud, in violation of 18 U.S.C. § 1341, (4)  use of fire to commit a felony, in violation of 18 U.S.C. § 844(h), and three additional counts of witness tampering, in violation of 18 U.S.C. § 1512(b).  A co-defendant, Josh Booty, was originally indicted with Smith, but pled guilty as charged to Counts 1 and 2 prior to trial, and testified in Smith's trial.  Smith later filed a Motion for Judgment of Acquittal and Motion for New Trial, which was denied by the Court.  See Volume 2, pp. 325-347, 349-434, 462-475.

On October 30, 2002, Smith appeared for sentencing, wherein she continued to maintain her innocence.[1]  Based upon the PSI recommendation of a base offense level of 24 plus two points for a leadership role, and two points for obstruction of justice, along with a criminal history category one, Smith was sentenced to 210 months imprisonment.  This sentence was based upon a guideline range of 78 to 97 months, plus a consecutive term of ten years under 18 U.S.C. § 844(h).

On appeal, the Fifth Circuit affirmed her conviction and sentence.  *United States v. Smith,* 354 F.3d 390 (5th Cir. 2004).  Her petition for certiorari was denied by the United States Supreme Court on March 22, 2004.  *United States v. Smith,* 124 S.Ct. 1698 (2004).

---

[1]Many of the arguments she sets forth herein were made as part of her lengthy elocution at sentencing.

The Court has reviewed the voluminous pleadings filed by Smith herein, and the government's response, thereby attempting to construe each and every argument properly brought under § 2255.[2]

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment guarantees the right to effective assistance of counsel in criminal prosecutions.[3]  In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established a two-prong test to evaluate ineffective assistance claims.  To obtain reversal of a conviction under the *Strickland* standard, the defendant must prove that counsel's performance fell below an objective standard of reasonableness[4] and that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome in the proceeding.[5]  A defendant's failure to satisfy one prong of the *Strickland* test negates a court's

---

[2]Certain claims (for example, her contention that ATF agents threatened her son after her conviction) are simply not relevant to habeas relief, or were properly considered on direct appeal (for example, Smith's assertion that a mis-application of the sentencing guidelines occurred).  *See Bousley v. United States,* 523 U.S. 614, 621 (1998); *United States v. Kalish,* 780 F.2d 506, 508 (5th Cir. 1986).

[3]*See McMann v. Richardson*, 397 U.S. 759, 711 n.14 (1970) (6th Amendment right to counsel is right to effective assistance of counsel).

[4]*See Strickland*, 466 U.S. at 687-88; *Harris v. Day*, 226 F.3d 361, 364 (5th Cir. 2000) (judicial scrutiny of counsel's performance must be highly deferential, given "strong presumption" that counsel's conduct was reasonable professional conduct).

[5]*See Strickland*, 466 U.S. at 687; *see also Williams v. Taylor*, 529 U.S. 362, 396-99 (2000).

need to consider the other.[6]  In deciding whether a counsel's performance was ineffective under *Strickland*, a court must consider the totality of the circumstances.[7]

Under the performance prong of *Strickland*, there is a "strong presumption"[8] that counsel's strategy and tactics fall "within the wide range of reasonable professional assistance."[9]  Courts have declined to characterize counsel's performance as ineffective assistance when counsel acted according to the defendant's restrictions on strategy,[10] when the defendant failed to provide counsel with complete and accurate information,[11] or when counsel refused to "assist[] the client in presenting false evidence or otherwise violating the law."[12]

---

[6]*See* 466 U.S. at 697; *see*, *e.g.*, *Martin v. Cain*, 246 F.3d 471, 477 (5th Cir. 2001) (court need not address *Strickland*'s performance prong because defendant could not show prejudice).

[7]*See* 466 U.S. at 690 (court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of reasonable professional judgment"); *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[T]he right to effective assistance of counsel. . . may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial.")

[8]In interpreting the prejudice prong, the Supreme Court has identified a narrow category of cases in which prejudice is presumed. *See Strickland*, 466 U.S. at 692 (1984). The presumption applies when there has been an "[a]ctual or constructive denial of the assistance of counsel altogether", when counsel is burdened by an actual conflict of interest, or when there are "various kinds of state interference with counsel's assistance." *See id; Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).   In these situations, prejudice is so likely to occur that a case-by-case inquiry is unnecessary.  The circumstances for presuming prejudice are not present herein. *See Strickland*, 466 U.S. at 692; *see also U.S. v. Cronic*, 466 U.S. 648, 658 (1984).

[9]*Strickland*, 466 U.S. 668, 689 (1984).

[10]*See, e.g.*, *Moore v. Johnson*, 194 F.3d 586, 607 (5th Cir. 1999) (counsel's purported failure to expend pretrial resources in an effort to unearth evidence that may have contradicted defendant's alibi defense was not ineffective assistance because defendant chose and insisted on alibi defense).

[11]*See e.g.*, *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997) (counsel's failure to avoid eliciting damaging testimony from defense witness was not ineffective assistance because defendant did not inform counsel he molested daughter).

[12]*Nix v. Whiteside*, 475 U.S. 157, 166, 171 (1986) (counsel provided effective assistance by preventing defendant from committing perjury).

Since prejudice is not presumed, the defendant must show that counsel's errors were prejudicial and deprived defendant of a "fair trial, a trial whose result is reliable."[13]  This burden generally is met by showing that the outcome of the proceeding would have been different but for counsel's errors.[14]  However, in some cases, the court will inquire further to determine whether counsel's ineffective assistance "deprive[d] the defendant of a substantive or procedural right to which the law entitles him."  In the context of a guilty plea, a defendant can satisfy the prejudice prong by demonstrating that but for counsel's deficient performance, a reasonable probability exists that the defendant would not have pleaded guilty and would have insisted on a trial.[15]  Similarly, in the context of a procedurally defaulted appeal, a defendant can satisfy the prejudice prong by demonstrating that there is a reasonable probability that, but for counsel's deficient failure to consult with defendant about an appeal, defendant would have timely appealed.[16]

---

[13]*Strickland*, 466 U.S. at 687. Unlike the performance prong of the *Strickland* test, which is analyzed at the time of trial, the prejudice prong of the *Strickland* test is examined under the law at the time the ineffective assistance claim is evaluated. *See Lockhart v. Fretwell*, 506 U.S. 364, 367-68 (1993).

[14]*See Williams v. Taylor*, 529 U.S. 362, 391-93 (2000). To prove prejudice, the defendant must establish a "reasonable probability" that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 692. The Court has rejected the proposition that the defendant must prove more likely than not that the outcome would have been altered. *See id.; see also Woodford v. Viscotti*, 537 U.S. 19, 22-23 (2002).

[15]*See Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see e.g. Daniel v. Cockrell*, 283 F.3d 697, 708 (5th Cir. 2002).

[16]*See Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000).

III.    **PETITIONER'S CONTENTIONS AND ANALYSIS**

Smith makes several allegations against her trial counsel, Mr. Rich Westling, arguing that his handling of her case fell below the *Strickland* standard. The Court will group and address these contentions as follows:

### A.     Failure to Prepare for Trial/Pre-Trial Activities

Smith claims that her trial counsel rendered ineffective assistance by

1.    Spending only 10 ½ hours preparing for trial. Pet. at 38.[17]

2.    Failing to object to co-counsel Chester Boyd's disqualification on grounds of conflict of interest and failing to provide Boyd copies of the government's discovery motions, so Boyd could make his own investigation. Pet. at 39; 45.

3.    Failing to object to the reliability of the tapes and transcripts used against her at trial. Pet. at 72.

4.    Failing to inform her that she faced consecutive sentences if convicted. Pet. at 50.

Smith's claims are belied by the record herein. First, the Court notes the number and quality of the pleadings filed by Attorney Richard Westling in this matter, including the Motion to Dismiss the Indictment, responses to various government motions, and a Motion to Exclude Rule 404(b) Evidence. At no time did the undersigned note Mr. Westling struggling to locate documents, portions of tape recordings, or other materials necessary for his cross examination of the government's witnesses, as well as the direct examination of defense witnesses. Lack of adequate

---

[17]All references to "Pet." are to Smith's habeas petition filed June 4, 2004. For the case of the court I have renumbered the petition in the bottom right hand of each page, since petitioner uses several different, often overlapping, numbering systems. References to "Ex. __" are to the lengthy exhibits attached to the petition. These are lettered by petitioner.

preparation for trial, especially a criminal trial where counsel does not always have the benefit of depositions and written discovery that is available in a civil case, is usually very apparent to both the judge and jury.  Such was not the case herein.

As to counsel's alleged failure to object to co-counsel Chester Boyd's disqualification, the Court recalls, and the record will reflect, that Mr. Westling indeed opposed the government's motion regarding Mr. Boyd's potential conflict of interest.  Mr. Westling also argued extensively, in chambers on the morning of the first day of trial, that Mr. Boyd should be allowed to participate. The Court disagreed, as Mr. Boyd was considered a possible trial witness;[18] however, because of Mr. Boyd's prior involvement and knowledge of certain portions of the issues in this case, allowed him to remain at counsel table to confer and advise Mr. Westling and the defendant.  Mr. Boyd did so.

With regard to the reliability of the tapes and transcripts used at trial, the Court sees no valid grounds for an objection under controlling Fifth Circuit jurisprudence.  A proper foundation for the tape recordings was provided with the appropriate witnesses, and the burden of carrying such objection would have been with the defendant, as the other party on the tape recordings was the defendant herself, who exercised her Fifth Amendment right.  Indeed, although the defendant argues that the failure to object to the use of the tapes and transcripts at trial should have been made, she provides no reasonable legal grounds upon which this Court might have sustained such an objection.

Lastly, with regard to Smith's allegations that her counsel failed to inform her of the legal requirement of consecutive sentences if convicted, she fails to point out the arraignments she

---

[18]As a possible trial witness, Boyd might well have escaped cross-examination by offering first-hand information to the jury in opening and/or closing arguments and through his questioning of other witnesses.

attended on the indictment and superseding indictments, wherein the magistrate judge advised her of the maximum possible statutory sentence.  Moreover, Smith does not state what consequences she suffered as a result of counsel's failure to advise her of the consecutive sentences.  She does not suggest that, had she known of the consecutive feature of the sentences, she would have entered, or even considered entering, a guilty plea to any of the counts charged.  Indeed, to this day, the defendant vigorously insists upon her innocence of all charges.

**B.** **Counsel's Alleged Failure to Impeach Witness Josh Booty**

Smith claims that her trial counsel rendered ineffective assistance by failing to impeach the testimony of Josh Booty ("Booty"):

1.  Smith claims that counsel failed to present testimony showing that she had no access to the reception hall she owned in Baton Rouge – the place Booty claimed the two met some 10–15 times to discuss the plot in December of 2000 and January of 2001 — until she closed her purchase of the property on January 11, 2001.  Pet. at 10.  This claim is bolstered by a statement from the former president of the Lions Club, which sold Smith the building, that Smith never had unaccompanied access to the hall prior to closing.  Ex. B-1.  Smith claims counsel never presented this witness' testimony, or offered documentary evidence concerning details of the sale the support her claim.  Smith also claims that counsel failed to interview the real estate agent who represented the seller to confirm these facts.  Pet. at 10.

2.  Smith claims that counsel failed to investigate and impeach Booty's testimony that they met when Smith was in Baton Rouge to visit her grandmother, who was in the hospital.  Smith claims her grandmother did not enter the hospital until March 14, 2001, two months after the fire.  This claim is supported by a bill for emergency transport services, actually dated March 12, 2001, and by a note (which Smith claims she received after her conviction) scribbled on a prescription pad from a Baton Rouge physician, claiming that "pt. was not in hospital between 12/00 – 1/01."  Ex. E.

3.       Smith claims counsel failed to investigate and impeach Booty's testimony
that Smith wanted the motel burned down because she was short of cash.
Pet. at 13–14.  She claims that counsel failed to interview her real estate
attorney, Ricky Simons, to show that she had funds available to cover her
closing costs for the purchase of the reception hall, Pet. at 13, or her
accountant, to show that she was not in financial trouble, Pet. at 61; Ex. EE.
She claims that counsel failed to conduct a pre-trial interview with her
banker, who did testify.  Pet. at 61.  She also claims that counsel failed to
introduce credit card statements to impeach the testimony of David Walle,
a representative of her insurance company, that she was in debt.  Pet. at 61.

4.       Smith claims counsel failed to investigate and impeach Booty's claim that he
filled the gas cans in question at a local Chevron the night of the fire.  Pet. at
9.  She bolsters this with the police lab report finding that the cans contained
"weathered" gasoline.  Ex. W.

5.       Smith claims that counsel failed to investigate and depose witnesses
concerning an alternative explanation for Booty's singed face:  that near the
time of the fire he was using an outdoor barbeque that blew up in his face.
Pet. at 21.

6.       Smith points to various instances of perjury in Booty's testimony, claiming
that counsel failed to investigate these lies and use them to impeach Booty.
Among the claims:

    i.       that Booty did assist in tearing down the building after the fire,
    despite his testimony to the contrary.  Ex. S.

    ii.      that Booty's description of her keychain does not match her actual
    keychain.  Pet. at 64.

    iii.     that Booty stole not two but three checks from her.  Pet. at 66; Ex.
    OO.

    iv.      that Stacy Spencer, her brother-in-law, never owned the gas can that
    Booty said he obtained from Spencer and used to start the fire.  Ex.
    Y.

As can be seen by the above listing, Smith offers a myriad of ways Josh Booty's testimony

could have been impeached.  Nonetheless, the Court notes that Booty was subjected to rigorous

9

cross examination by counsel, during which his credibility was attacked on several grounds. Moreover, counsel got Booty to admit to the jury that he was hoping for a more lenient sentence in return for his testimony. He also was questioned extensively about his bias against or motive to lie about Smith, which testimony was supported by that of Smith's husband, Spencer, called in the defense's case.

In fact, a rare circumstance occurred during trial wherein the witness was recalled to the stand, almost immediately upon leaving it, to suffer a further attack on his credibility. Booty was questioned about stealing a check or checks from Smith, which he denied on the stand. Shortly thereafter, Booty admitted to the Assistant United States Attorney that he had just lied about stealing the money while testifying. The Court allowed the AUSA to put Booty back on the stand to admit that he had just lied to the jury, and allowed Smith's counsel to again cross examine him about this latest lie. Thus, Booty's credibility (or lack thereof) was dramatically demonstrated.

In short, the Court finds that Booty's credibility was assailed, as argued by defense counsel in closing argument, however, those critical portions of Booty's testimony were bolstered by tangible evidence and other credible witnesses, such as Anthony Turnley, with whom Booty conversed during the course of the commission of the crime. Moreover, the tape recordings of the defendant conversing with Booty surely could have supported those portions of Booty's testimony which the jury may have accepted as true. In other words, even had Booty's testimony been further attacked to the extent Smith argues, the totality of the corroborating evidence would have likely overcome the further deterioration of Booty's credibility along the lines suggested in Smith's application.

**C.      Counsel's Alleged Failure to Investigate and Present Material Witnesses**

Smith claims that counsel rendered ineffective assistance by failing to present other witnesses crucial to her defense who could cast doubt on the government's case and establish that she was the victim of a conspiracy by town leaders.

> 1.      Smith claims that counsel failed to investigate and present the testimony of Leonard Biggs, owner of a Memphis wrecking company, who could have testified that her trip to Memphis the day of the fire was not pre-planned, and thus case doubt on the government's contention that she had manufactured an alibi for that day.  Pet. at 11.

> 2.      Smith claims that counsel failed to investigate and call Sythera Stokes, Roscoe Beeson, Blanche Eschete, Penny Geautreaux,[19] and Teresa Currens, who were all prepared to testify that she had been threatened by Grand Isle's mayor and fire chief on numerous occasions, including a specific threat by the fire chief to "burn [her] out."  Pet. at 12; Ex. G-1; G-2; T, V-1, and V-2.

> 3.      Smith claims that counsel failed to investigate and present the testimony of Glenn Geautreaux, who entered the burning motel with local police officers. In his testimony, ATF Special Agent Daniel Hebert ("Hebert") claimed that an officer who entered the building slipped and fell in a pool of gasoline on the floor.  Ex. GG.  In a statement in Smith's exhibits, Mr. Geautreaux claims to have been with the officer when he entered the building and disputes that the officer slipped in gasoline.[20]  Ex. R.  Smith claims that counsel failed to impeach Hebert with this testimony.  Pet. at 23.

> 4.      Smith claims that counsel failed to call her son, Jonathon Williams, to rebut Booty's testimony about the origins of the conspiracy.  Pet. at 73.

Initially, and as set forth further herein, the Court notes that Smith's claim to being elsewhere at the time of the fire, i.e. her alibi, to be of no moment, and therefore lacks merit. In fact, as the

---

[19]Smith also claims, *supra*, that a record of an interview with Mrs. Geautreaux provided to the defense was manufactured by ATF Special Agent Daniel Hebert.

[20]The statement does, however, note that Mr. Geautreaux smelled gas on entering the building.

government set forth at trial, it is established that Smith was out of town during the relevant time period.  Thus, whether Smith went to Memphis regularly, and whether her trip to Memphis on the day of the fire was planned or not,  is  inconsequential to the  allegations and evidence presented at trial.  In short, it is immaterial whether Smith planned to be in Memphis on the day of the fire, or went to Memphis as part of a regularly scheduled trip she frequently takes for business purposes. And, it is undisputed that she was, in fact, on a trip to Memphis the day of the fire.

As to Smith's claim that others would testify about threats against her by Grand Isle's mayor and fire chief on numerous occasions, the Court fails to see how the establishment of these threats before the jury, even assuming such threats were credible, would have likewise established Smith's innocence.  The fact that others on Grand Isle may have been hostile to her does not logically force the conclusion that (a) Smith was innocent of all allegations, or (b) any of those who threatened Smith were, in fact, perpetrators of the fire at the Rusty Pelican.  In fact, based upon the information provided to the Court with regard to such evidence, it seems clear that an antagonistic relationship existed between Smith and some individuals on Grand Isle.  Nonetheless, such evidence, construed with the audio tapes featuring Smith herself, could reasonably be portrayed as motivation for Smith to foist blame on these officials, when it was established that she was aware, early on (if not before, as the evidence proved) that Josh Booty was the one who set the fire.

As to ATF Agent Hebert's testimony, the Court notes that Mr. Westling did cross examine Agent Hebert about the limits of physical evidence gathered in this case.  In fact, Mr. Westling challenged the admissibility of certain testimony which Agent Hebert was not allowed to give. Further establishing the lack of merit of Smith's contention herein is Smith's recorded statements

discussing the location of the gas cans Josh Booty used in the arson.  When confronted with his own client's damning testimony, counsel was hardly in a position to rebut his client's incriminating statements, which tended to confirm Agent Hebert's testimony.

As for the failure to call Jonathon Williams, Smith's son, to the stand, the Court fails to see how such testimony would have been helpful, and such a witness could surely have only assisted the government in its burden of proof.  Jonathon Williams provided a tape recorded statement to the ATF, in which he confirmed Smith's notion of burning down the Rusty Pelican, and asked if he would do it, whereupon he referred her to Josh.  Although he later stated that he thought Smith's comments were made in a joking manner, he admitted that she had, in fact, made them.  Moreover, Smith's own tape recorded statements that Jonathon would "never crack" (Vol. 4, pp. 283-84) indicate that Jonathon Williams was aware of the circumstances of the fire, and the risk of incarceration faced by Smith and Booty.  Williams would, without a doubt, be faced with taped statements made by Smith involving him in the scheme, and would be cross-examined by the government on those statements.  Any attempt by Williams to testify at trial that Booty's version of the origins of the conspiracy was incorrect would surely be contradicted by not only Booty's live testimony, but that of Turnley as well, in addition to Smith's tape recorded statements.  Thus, even in retrospect, the decision not to call Williams to testify seems a wise one.

### D.    Counsel's Alleged Failure to Present Favored Defense

Smith claims that counsel rendered ineffective assistance by failing to present her favored defense.  She claims that she had an alibi for the months of December 2000 and January 2001, and thus could not have met Booty 10–15 times in Baton Rouge to discuss the plot to burn the motel.

Pet. at 47.  She supports this assertion with a lengthy compilation of telephone logs, credit card receipts, personal calendar entries, and reconstructed itineraries purporting to show that her movements in those months are fully accounted for.  See Ex. A.  As a corollary to this claim, she claims that counsel rendered ineffective assistance by failing to allow her to take the stand and present her alibi.  Pet. at 49.

As best the Court can determine by Smith's assertions, she believes that Mr. Westling failed to establish an alibi for her during the relevant time period.  As referenced above, however, the perpetration of the crimes herein by Smith is in no way contingent on her being in physical attendance at the commission of the arson.  It is undisputed that Smith was not present when Booty traveled to Grand Isle, set the fire, and returned to Baton Rouge.  The documents compiled by Smith to establish her whereabouts prior to, during, and after the commission of the fire quite simply are of no moment.  Indeed were Smith to have taken the stand and testified accordingly, such information also would not preclude the jury's verdict of guilty herein.

Smith also seems to suggest that the admitted perpetrator of the arson, Josh Booty, also had an alibi on the day of the fire.  She claims that Booty's singed hair was the result of a barbecuing incident, not the commission of the arson at the Rusty Pelican, and that Westling should have offered such information to the jury.  Of course, this flies in the face of Booty's own testimony that he committed the arson, and pled guilty to it.  Moreover, the tape recordings offered at trial confirm that Booty's singed hair, and his whereabouts on the day of the fire, were clearly consistent with the government's allegations.

14

## IV.    PROSECUTORIAL MISCONDUCT

Smith's § 2255 Petition also claims that the government committed acts of misconduct in the handling of her prosecution.  Smith claims that agents of the ATF manufactured evidence and that the government engaged in vindictive prosecution.

1.    Smith claims that a record of an interview with Penny Geautreaux provided to the defense was manufactured by ATF agents.  She bolsters the claim with a statement from Mrs. Geautreaux that she was never interviewed by any ATF agent.  Ex. DD.

2.    Smith claims that the government engaged in vindictive prosecution by adding a superseding indictment.  To support this claim, she notes that she was approached for information concerning the whereabouts of wanted felon Whitey Bulger and refused to provide that information, which caused AUSA Tania Tetlow ("Tetlow") to add the additional charge of using fire to commit a federal felony.  Pet. at 82–83.

3.    Smith accuses Tetlow of subpoenaing witnesses crucial to her defense in an attempt to keep those witnesses from speaking with her defense team.  Pet. at 98.

As an initial matter, Smith's application fails to explain how such alleged actions would be exculpatory or would have impacted the resulting jury verdict.  For instance, although Smith claims that Penny Geautreaux was never interviewed by any ATF agent, and thus the ATF's record of the Geautreaux interview was manufactured, the Court notes that the allegedly manufactured interview of Ms. Geautreaux is entirely supportive of Smith's innocence.  In other words, if the ATF were to fabricate the terms of an interview an agent conducted with Ms. Geautreaux, such fabrication would logically contain inculpatory statements attributed to Ms. Geautreaux.  In this instance, Smith contends that the ATF falsified the contents of an interview by attributing statements to Ms. Geautreaux which would tend to demonstrate Smith's innocence, and then produce such statement for the prosecution.

15

Smith also claims that the government's superseding of her indictment was done for vindictive and improper purposes.  She claims that the additional counts were added as a result of her refusal to cooperate with the government's investigation of wanted felon Whitey Bulger.  But Smith cannot demonstrate that the additional counts were frivolous or unsupportable, and, in fact, she was convicted of those counts by the jury, after the Grand Jury found probable cause for those counts to be added.  Thus, the Court sees no ill motive on behalf of the government by seeking a Grand Jury's indictment, and subsequently proving to the jury at trial, counts which are supportable beyond a reasonable doubt.

As for Smith's accusation that the Assistant U.S. Attorney subpoenaed witnesses crucial to her defense in an attempt to keep those witnesses from speaking with her defense team, the Court finds such claim to be without merit, as those witnesses were only subpoenaed to testify, they were not deemed untouchable to defense counsel.

Smith raises other issues[21] regarding prosecutorial misconduct, all of which have been the subject of either her motion for new trial or her appeal.  With regard to alleged improprieties by the government in the conduct of the Grand Jury, the Court finds no merit to her assertions that exculpatory evidence involving other activities on Grand Isle at times before and during the activities herein occurred, the Court finds such claims without merit under *Davis v. United States,* 411 U.S. 233 (1973), and further notes that defense counsel filed a motion to dismiss the indictment on other grounds related to assertions made by Smith herein.

---

[21]Smith previously made Napue claims in her motion for new trial.  *See United States v. Smith,* 202 WL 31190919 E.D. La. 2002.

## V.    MOTION FOR SPECIFIC PERFORMANCE OF RULE 35

Smith has also filed a "Motion for Specific Performance of Rule 35", wherein she seeks an evidentiary hearing in order to illicit testimony that would demonstrate her substantial assistance and cooperation with authorities.  She indicates that subpoenas should be issued and served on the following individuals:

        Tim Luce  –  Boston State Police Investigator #1384
        470 Worcester Road
        Framingham, MA  01702

        Jimmy White  –  Boston State Police Supervisor
        470 Worcester Road
        Framingham, MA  01702

        Chester H. Boyd, Attorney at Law
        8819 Highland Road, Suite D
        Baton Rouge, LA  70816

        Fred Wyshack – United States Attorney, Boston MA
        One Courthouse Way, Suite 9200
        Boston, MA  02210.

The government opposes defendant's motion, citing *Wade v. United States,* 504 U.S. 181, 112 S.Ct. 1840 (1992) and *United States v. Sneed,* 63 F.3d 381 (5th Cir. 1995).

After reviewing the Petition and Motion submitted by Smith, the Court does not find that an evidentiary hearing is necessary.  Smith does not allege that the government was motivated by unconstitutional considerations, nor that the government made any promise or commitment to file a Rule 35 motion.  In fact, by letter dated November 5, 2002, submitted to the undersigned a few days before sentencing, the government advised that the defendant had commenced providing information, and was cooperating, but that such cooperation had not yet been evaluated in order to

determine what sentencing relief might be warranted on the basis of "substantial assistance." Whether or not Smith's assistance was substantial, and whatever these witnesses might say at an evidentiary hearing, has not been shown to support unconstitutional activity or motive. *See United States v. Jackson,* 22 F.3d 583, 585-586 (5th Cir. 1994).  For these reasons, the defendant's "Motion for Specific Performance of Rule 35" is **DENIED.**

### CONCLUSION

For the reasons stated herein, the defendant's Application for Habeas Relief Pursuant to 28 U.S.C. § 2255 be and is hereby **DENIED.**

New Orleans, Louisiana, this ___26th___ day of September, 2006.

_____
**KURT D. ENGELHARDT**
**United States District Judge**